Exhibit A

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                            SUPERIOR COURT DEPARTMENT OF
                                        THE TRIAL COURT

|  |  |
|---|---|
| JAMES WINES, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 2482CV01098 |
|  | ) |
| PRESIDENT & FELLOWS OF HARVARD | ) |
| COLLEGE d/b/a HARVARD MEDICAL SCHOOL | ) |
|  | ) |
| Defendant. | ) |

## COMPLAINT AND JURY DEMAND

### PARTIES

1.      Plaintiff James D. Wines, Jr., M.D., M.P.H., resides in Quincy, Norfolk County,

Massachusetts.

2.      The President and Fellows of Harvard College is a nonprofit corporation

established under the laws and Constitution of the Commonwealth of Massachusetts that

operates its Harvard Medical School ("Defendant," "Harvard," or "HMS").  Harvard's principal

location is in Cambridge, Middlesex County, Massachusetts.

### FACTS

3.      HMS faculty appointments are among the most prestigious academic credentials

in the medical field.  The appointment process is incredibly competitive and rigorous.

Candidates for the Instructor position are expected to demonstrate academic excellence, the

recommendations of respected colleagues in medicine, scholarly achievements such as successful publications, the potential for obtaining research funding, and a commitment to teaching and mentoring Harvard students.  Before being appointed to the Instructor position, a candidate must face multiple rounds of review—by HMS Department Heads and Harvard's Office for Faculty Affairs—and be selected out of a collection of peers.

4.      Once someone has been appointed as an HMS Instructor, he or she is a Harvard faculty member with rights and benefits.  An Instructor has a constitutionally protected interest in his or her earned academic appointment.  This protected interest is akin to the protected interests doctors hold in their medical licenses, university graduates hold in their degrees, and students hold in their university enrollment.

5.      An HMS Instructor appointment confers substantial financial and professional benefits on the doctor who achieves the credential, all of which are compensation for his or her contributions to the university.  In addition to the earned prestige that comes with the appointment, Instructors also enjoy more research, grant, and publication opportunities than their peers.  Perhaps the most significant financial value of the HMS Instructor appointment is its direct impact on a doctor's future earning potential.  HMS Instructors are highly sought after by hospitals across the United States.  Instructors are more likely to receive clinical or research employment positions than their peers.  Further, as a result of their academic appointment, Instructors are more likely to receive prestigious positions at top hospitals that provide more lucrative compensation.  That is, HMS Instructors receive many more and meaningfully better opportunities for professional career development than doctors who have not earned the appointment.  For these reasons, academic appointments to the HMS faculty are more important and valuable for doctors' professional careers than any particular employment role.

6.      In 1989, Dr. Wines became an Intern in Medicine at Massachusetts General Hospital.  In 1990, he earned a Clinical Fellowship in Psychiatry from HMS.  In 1993, Dr. Wines earned an academic appointment in HMS's Faculty of Medicine as an HMS Instructor of Psychiatry.  Dr. Wines held this HMS academic appointment for nearly thirty years.

7.      Approximately every two or three years, HMS would renew Dr. Wines's appointment as Instructor.  At least one colleague familiar with HMS's faculty appointment process communicated to Dr. Wines that, given his extensive expertise, mentorship, and research contributions in psychiatry and psychopharmacology, HMS would likely promote him to the higher appointment of Assistant Professor in Psychiatry if he was interested in seeking that role. All of Dr. Wines's interactions with HMS faculty members supported his reasonable and well-founded expectation that his faculty appointment would continue to be renewed (and even promoted) throughout the course of his career.  Dr. Wines had intended to remain a Harvard faculty member for the entirety of his career, and to potentially seek promotion to the role of Assistant Professor.

8.      Throughout his time as an HMS faculty member, Dr. Wines's relationship with HMS was governed by the HMS Faculty of Medicine Handbook (the "HMS Handbook"), which includes by reference a Non-Discrimination Policy.[1]

---

[1] The version of the HMS Faculty of Medicine Handbook that is currently in effect is available online at https://facultyhandbook.hms.harvard.edu/.  Upon information and belief, an earlier version of the HMS Handbook (of which Harvard presumably has custody) had been in effect in 1989, at the time when Dr. Wines was initially appointed as an HMS Instructor.  Upon information and belief, yet another version of the HMS Handbook was in effect at the time when Dr. Wines's faculty appointment had most recently been renewed.

The current version of the Harvard University Non-Discrimination Policy is available online at https://provost.harvard.edu/files/provost/files/non-discrimination_and_anti-bullying_policies.pdf.

9.      On or around November 10, 2021, Dr. Wines discovered that his academic appointment as an HMS Instructor was involuntarily terminated, without notice or cause.  Dr. Wines only discovered this adverse action because he happened to call into the Harvard Registrar's Office in or around the week when HMS had terminated his appointment.  It does not appear that anyone at Harvard would have even informed Dr. Wines that his appointment had been terminated, had Dr. Wines himself not reached out himself and stumbled upon that information.

10.     Upon information and belief, it is incredibly rare for Instructors to involuntarily lose their academic appointments at HMS.  Instead, virtually all Instructors maintain their appointments unless and until they decide to retire, move to another university, or seek promotion to a higher HMS faculty position.  Section 4.5 of the HMS Handbook explicitly states that faculty members like Instructors "may be reappointed at any rank indefinitely."  In fact, throughout his nearly thirty years as an HMS faculty member, Dr. Wines never learned of any HMS faculty member being involuntarily terminated, until he discovered his own termination in November 2021.

11.     Upon information and belief, based on the timing of Harvard's involuntarily termination of Dr. Wines's faculty appointment, that termination was based wholly, or in large part, on Harvard-affiliate Mass General Brigham's wrongful, discriminatory treatment of Dr. Wines.

12.     On June 24, 2021, Mass General Brigham's President and CEO, Ann Klibanski, announced that all employees would be required to receive one of three COVID-19 vaccines, with the exception of employees who were granted exemptions for "medical and religious reasons."

4

13.     On or about September 2, 2021, Dr. Wines timely submitted both a Medical Exemption Request and a Religious Exemption Request (together, the "Exemption Requests") to Mass General Brigham, seeking reasonable accommodations under the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act.  Dr. Wines's Exemption Requests explained that (a) the COVID-19 vaccines posed significant medical contraindications for his health; and (b) his sincerely held religious beliefs rendered the vaccines morally repugnant, including because all COVID-19 vaccines available at that time utilized aborted fetal tissue in their design, testing, and/or production.

14.     Mass General Brigham denied Dr. Wines's Medical Exemption Request on September 17, 2021.  The hospital system then denied Dr. Wines's Religious Exemption Request on September 23, 2021.  These denials contained virtually no discussion, other than to state that the Exemption Requests were not "sufficient" and that there was "no appeal process."  Mass General Brigham did not engage in any meaningful discussion or exemption review process, nor did it disclose information about the evaluation criteria, review process, or identity or qualification of the decisionmakers involved in denying Dr. Wines's Exemption Requests.  Upon information and belief, Mass General Brigham had predetermined that it would deny most or all medical and religious exemption requests.

15.     Mass General Brigham involuntarily terminated Dr. Wines's employment on November 10, 2021, because of his inability to receive a COVID-19 vaccination for medical and religious reasons.  This adverse treatment by Mass General Brigham violated Dr. Wines's constitutional rights to equal protection, substantive due process, procedural due process, and free exercise of religion.  Mass General Brigham's wrongful termination of Dr. Wines also violated the ADA and Title VII of the Civil Rights Act.

16.     Upon information and belief, at or around the same time when Mass General Brigham illegally terminated Dr. Wines's employment, HMS involuntarily terminated his academic appointment as an HMS Instructor of Psychiatry.  Upon information and belief, the sole basis for Harvard's decision to deprive Dr. Wines of his academic appointment was the fact that Mass General Brigham had separately terminated Dr. Wines's employment.  Dr. Wines received no notice or warning of any sort from HMS that he may be stripped of his academic appointment.  HMS provided Dr. Wines no process before terminating his appointment; he was not given the opportunity to be heard, submit a request for religious or medical exemption requests, or appeal the adverse decision.  HMS's involuntary termination of Dr. Wines's faculty appointment was completely devoid of procedural due process.  Because, upon information and belief, HMS based its termination decision on Mass General Brigham's decisionmaking, HMS's adverse decision was tainted by the same religious, medical, and academic viewpoint discrimination underlying Mass General Brigham's wrongful termination.  The fact that HMS may have "outsourced" its termination decisionmaking to another party does not immunize HMS from liability for the wrongfulness or discriminatory nature of the termination.

17.     Dr. Wines never voluntarily terminated either his employment at Mass General Brigham or his academic appointment at HMS.

18.     Harvard's involuntary termination of Dr. Wines's academic appointment violated the contractual obligations established in the HMS Handbook in multiple respects.

19.     Section 4.6 of the HMS Handbook, titled "Termination Documentation and Lengths of Notice," provides that faculty members like Instructors should receive "written notice of the . . . loss of the Harvard appointment if the termination is to occur prior to the conclusion of the designated term.  The expected period of notice would be: . . .  Instructors . . . three (3)

months . . . ."  In violation of Section 4.6, HMS provided Dr. Wines no notice—written or

verbal—that his faculty appointment was being involuntarily terminated.  Instead, Dr. Wines had

to reach out to HMS to discover that that adverse action was imposed without his knowledge.

Upon information and belief, HMS's involuntary termination took place before the conclusion of

the designated term for Dr. Wines's Instructor appointment.

     20.    Section 3.2 of the HMS Handbook is titled "Academic Freedom: Rights and

Responsibilities for All Faculty."  Section 3.2 states:

> Harvard University has promulgated statements regarding rights, responsibilities,
> and community values, which govern our activities.  In keeping with the
> traditional concepts of academic freedom, faculty cannot be dismissed for holding
> controversial opinions, for proposing heretical viewpoints, or for espousing
> unpopular causes.  They are all entitled to the classical protection of the academy
> in the pursuit of knowledge, in their teaching, and in the publication of findings
> and opinions.

In violation of Section 3.2, Dr. Wines, an HMS faculty member was "dismissed for holding

controversial opinions, for proposing heretical viewpoints, or for espousing unpopular causes."

Specifically, Dr. Wines's termination from the HMS faculty was premised on Mass General

Brigham's decisionmaking, which was in turn premised on viewpoint discrimination against Dr.

Wines's controversial minority viewpoint related to COVID-19 vaccines.

     21.    Section 3.3 of the HMS Handbook is titled "Non-Discrimination and Non-

Bullying."  Section 3.3 states:

> It is the strong and consistent policy of Harvard University, Harvard Medical
> School, and Harvard School of Dental Medicine, to treat all members of the
> communities with respect, to provide an environment conducive to learning and
> working, and to ensure equal access to rights, privileges and opportunities without
> regard to race, color, religion, sex, national origin, disability status, protected
> veteran status, gender identity, sexual orientation, pregnancy and pregnancy-
> related conditions or any other characteristic protected by law or deemed by
> Harvard to warrant equal rights protection under applicable policies.

HMS violated its contractual obligations under Section 3.3 by terminating Dr. Wines's faculty appointment on the basis of Mass General Brigham's decision, which was in turn premised on discrimination against Dr. Wines because of his religious beliefs, disability status, creed,[2] and political beliefs.[3]

22.    Section 3.3 also incorporates by reference the Harvard University Non-Discrimination Policy, which states:

> Discrimination on the basis of the following protected categories, or any other legally protected basis, is unlawful and is prohibited by this Policy[:] . . . religion . . . creed . . . disability . . . political beliefs . . . .  Discrimination is adverse treatment of an individual based on one or more of the protected characteristics listed in this Policy.  In a university setting, complaints of discrimination may arise in the employment context and the education context, in the following potential forms: . . .  Terminating, suspending, dismissing, or expelling an individual based on their protected characteristic.

HMS violated Section 3.3 by terminating Dr. Wines on the basis of Mass General Brigham's decision, which was in turn based on discrimination against Dr. Wines because of his religious beliefs, disability status, creed, and political beliefs.

23.    Upon information and belief, if Dr. Wines had received a COVID-19 vaccination—despite his medical contraindications and sincerely held religious objections against doing so—HMS would not have terminated Dr. Wines's faculty appointment, and Dr. Wines would still hold an HMS faulty appointment to this day.  Similarly, even after Dr. Wines's HMS appointment was terminated, if he had then given into pressure to receive a COVID-19

---

[2] Creed is "deemed by Harvard to warrant equal rights protection under applicable policies," specifically, under the Harvard University Non-Discrimination Policy.  *See* Compl. ¶ 22.

[3] Political beliefs are "deemed by Harvard to warrant equal rights protection under applicable policies," specifically, under the Harvard University Non-Discrimination Policy.  *See* Compl. ¶ 22.

vaccination, upon information and belief, HMS would have reinstated Dr. Wines's faculty appointment.

24.     HMS has caused Dr. Wines significant harm by wrongfully stripping him of his earned academic appointment as an HMS Instructor.  Since being involuntarily terminated by HMS, and as a direct result of that termination, Dr. Wines has lost out on potential research, publication, grant, employment, and other professional opportunities.  HMS's wrongful termination has also caused lost wages, lost benefits, costs related to survival without income from work, and stress to Dr. Wines and his family.  The loss of his academic appointment has also harmed Dr. Wines's reputation and his ability to obtain future academic and professional opportunities.  To be clear, even though non-party Mass General Brigham chose to wrongfully terminate Dr. Wines's employment, Dr. Wines's academic appointment as an HMS Instructor would have made him a very desirable candidate for prestigious, lucrative professional opportunities.  That is, Dr. Wines suffered additional losses that he would not have suffered but for HMS's decision to wrongfully terminate his academic appointment.  HMS is therefore directly responsible for causing Dr. Wines financial, emotional, and reputational harms.

25.     Harvard—like its affiliate Mass General Brigham—was effectively a state actor with respect to the conduct at issue.  Upon information and belief, Harvard and Mass General Brigham were subjected to coercion by State and Federal governments to enact mandatory COVID-19 vaccination requirements so that they would not lose any governmental funding, which is a key component of and essential to the functioning of Harvard and Mass General Brigham.  Like Mass General Brigham, Harvard announced on or about July 8, 2021, that it would require all faculty members to receive COVID-19 vaccinations.  Upon information and belief, Harvard and Mass General Brigham received incentives from the government for

implementing and maintaining COVID-19 related mandates.  These government inducements

include, but are not limited to the Centers for Medicare & Medicaid Services (hereinafter,

"CMS"), the Federal Emergency Management Agency (hereinafter, "FEMA"), the Coronavirus

Aid, Relief, and Economic Security Act (hereinafter, "CARES"), National Institutes of Health

(hereinafter, "NIH"), etc.  State and Federal governments caused private entities, including

Harvard and Mass General Brigham, to enact and regulate COVID-19 policies and mandates for

purposes deemed by such governments to be necessary, resulting in the private entities doing the

bidding of the government.  Essentially, Harvard, like Mass General Brigham, was caused to

take on a state/public function to implement, mandate and regulate policies to deal with COVID-

19.

## CLAIMS FOR RELIEF

## COUNT I – BREACH OF CONTRACT

26.     Dr. Wines realleges and incorporates herein the allegations contained within the

foregoing paragraphs of this Complaint.

27.     The HMS Handbook (including the Harvard University Non-Discrimination

Policy it incorporates by reference) is a binding contract between Harvard and its faculty

members.  Dr. Wines was an HMS faculty member until HMS wrongfully terminated his

appointment in or around November 2021.

28.     HMS materially breached the HMS Handbook by involuntarily terminating Dr.

Wines's faculty appointment without cause and without notice.  *See* HMS Handbook § 4.6.

29.     HMS also materially breached the HMS Handbook and Harvard University Non-

Discrimination Policy by involuntarily terminating Dr. Wines's faculty appointment on the basis

of his religious beliefs, disability status, creed, and political beliefs. *See* HMS Handbook §§ 3.2, 3.3.

30.     Dr. Wines has been harmed by these breaches.

31.     Dr. Wines is entitled to damages as a result of these breaches.

## COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING

32.     Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

33.     The HMS Handbook (including the Harvard University Non-Discrimination Policy it incorporates by reference) is an enforceable contract that contains a covenant of good faith and fair dealing.

34.     By virtue of the acts described above, HMS breached this covenant.

35.     The HMS Handbook explicitly states that faculty members have rights to academic freedom and freedom from discrimination. *See* HMS Handbook §§ 3.2, 3.3. The HMS Handbook further provides that faculty members may not be terminated on the basis of religious beliefs, disability status, creed, political beliefs, or controversial academic perspectives. *See id.* To the extent that the HMS Handbook does not explicitly state whether termination may be based on a *third party's* discrimination towards an HMS faculty member, the implied covenant would operate to prohibit HMS from taking any adverse action against a faculty member on the basis of such third-party discrimination. HMS's decision to involuntarily terminate Dr. Wines's faculty appointment, on the basis of another entity's discriminatory action towards him, effectively destroyed Dr. Wines's right to receive the fruit of his agreement with HMS.

11

36.     Dr. Wines has been harmed by HMS's breach of the implied covenant of good faith and fair dealing.

37.     Dr. Wines is entitled to damages as a result of this breach.

## COUNT III – VIOLATION OF THE MASSACHUSETTS CIVIL RIGHTS ACT

38.     Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

39.     Dr. Wines has the right to procedural due process, substantive due process, equal protection, and to free exercise of religion, as guaranteed to him by the United States Constitution and Massachusetts Constitution.

40.     HMS interfered with, or attempted to interfere with, Dr. Wines's exercise or enjoyment of those constitutional rights.

41.     HMS used threats, intimidation, and coercion to interfere, or attempt to interfere, with Dr. Wines's constitutional rights by, among other things, improperly stripping away an earned academic appointment Dr. Wines had held for nearly thirty years, harming Dr. Wines's reputation and ability to obtain employment and academic roles in the medical field, and committing this harm as a manner of attempting to compel Dr. Wines to receive a COVID-19 vaccination despite his sincerely held religious beliefs against the COVID-19 vaccines.

42.     Upon information and belief, Dr. Wines's termination was intended to (a) deter him from exercising his sincerely held religious beliefs; (b) compel him to act in a manner repugnant to his religious beliefs; and (c) apply moral force against him in an attempt to constrain him into receiving, against his will, a medical intervention that was contradictory to his religious beliefs.

43.     Because of HMS's conduct and inactions as aforementioned, HMS violated the Massachusetts Civil Rights Act, G.L. c. 12, §§ 11H–11J.

44.     Dr. Wines has been harmed by HMS's violation of the Massachusetts Civil Rights Act.

45.     Dr. Wines is entitled to damages as a result of this violation.

<u>**COUNT IV – VIOLATION OF PLAINTIFF'S
PROCEDURAL DUE PROCESS RIGHTS**</u>

46.     Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

47.     The actions of HMS denied Dr. Wines his right to Due Process of Law as guaranteed to him by the United States Constitution and Massachusetts Declaration of Rights.

48.     HMS deprived Dr. Wines of his constitutionally protected interest (an earned academic appointment as an HMS Instructor of Psychiatry) without notice; an opportunity for Dr. Wines to be heard; or any proceeding during which Dr. Wines could hear any evidence against him, respond to it directly himself, or call witnesses.

49.     HMS was a state actor and/or instrumentality of the government for purposes of the conduct at issue.

50.     Because of HMS's conduct and inactions as aforementioned, Dr. Wines's procedural due process rights were denied and violated.

51.     Dr. Wines has been harmed by HMS's violation of his constitutional rights.

52.     Dr. Wines is entitled to damages as a result of these violations.

## COUNT V – VIOLATION OF PLAINTIFF'S
## SUBSTANTIVE DUE PROCESS RIGHTS

53.     Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

54.      Dr. Wines has the right and protected interest under the First, Fourth and Fourteenth Amendment to the United States Constitution and Articles IV, X, XX, XXI, XXIX, and XXX of the Massachusetts Declaration of Rights to be free from the invasion of bodily integrity and to be free from unwanted medical intervention.

55.     Because of these rights enjoyed by Dr. Wines under both the United States Constitution and the Massachusetts Declaration of Rights, his substantive due process rights were denied when HMS terminated his faculty appointment because of consequences Dr. Wines faced as a direct result of his inability to receive a COVID-19 vaccinations on the basis of his medical contraindications and sincerely held religious beliefs.  To the extent that Mass Brigham General was the party to originally violate Dr. Wines's substantive due process rights, HMS ratified and adopted Mass General Brigham's constitutional violation when it also chose to strip Dr. Wines of his faculty appointment.

56.     HMS was a state actor and/or instrumentality of the government for purposes of the conduct at issue.

57.     Because of HMS's conduct and inactions as aforementioned, Dr. Wines's substantive due process rights were denied and violated.

58.     Dr. Wines has been harmed by HMS's violation of his constitutional rights.

59.     Dr. Wines is entitled to damages as a result of these violations.

14

## COUNT VI – VIOLATION OF PLAINTIFF'S
## EQUAL PROTECTION & TREATMENT RIGHTS

60.     Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

61.     The actions of HMS denied Dr. Wines his right to Equal Protection and equal treatment as guaranteed to him by the United States Constitution and Massachusetts Constitution.

62.     HMS singled out Dr. Wines for selective treatment based upon his sincerely held religious objections to the COVID-19 vaccines.  To the extent that Mass Brigham General was the party to originally single out Dr. Wines for adverse treatment because of his religious beliefs, HMS ratified and adopted Mass General Brigham's discriminatory treatment when HMS also chose to strip Dr. Wines of his faculty appointment.

63.     In effect, HMS discriminated between religion and nonreligion by allowing those without religious objections to the COVID-19 vaccines to continue on as faculty members, although Dr. Wines was similarly situated with respect to expertise, mentorship contributions, and research contributions.

64.     Pursuant to the Fourteenth Amendment to the United States Constitution, and the Massachusetts Constitution, Dr. Wines is guaranteed the right to equal protection and due process of laws.

65.     Dr. Wines had a right to be treated equally with HMS faculty members who are nonreligious or have different religious beliefs.

66.     Dr. Wines had no adequate remedy at law to protect him against the continuing deprivation of his most cherished constitutional liberties and his sincerely held religious beliefs.

67.     Dr. Wines was treated differently than other HMS faculty members who had no religious objection to the COVID-19 vaccines.  HMS involuntarily terminated Dr. Wines's faculty appointment because his sincerely held religious beliefs were not accommodated and Mass General Brigham wrongfully terminated his employment.  To the extent that Mass Brigham General was the party to originally violate Dr. Wines's equal protection rights, HMS ratified and adopted Mass General Brigham's constitutional violation when HMS also chose to strip Dr. Wines of his faculty appointment.

68.     HMS was a state actor and/or instrumentality of the government for purposes of the conduct at issue.

69.     HMS has deprived Dr. Wines of the equal protection of the laws under United States Constitution and Massachusetts Constitution by terminating his faculty appointment on the basis of religious discrimination against him.

70.     Dr. Wines has been harmed by HMS's violation of his constitutional rights.

71.     Dr. Wines is entitled to damages as a result of these violations.

## COUNT VII – VIOLATION OF THE FREE EXERCISE CLAUSE OF THE UNITED STATES CONSTITUTION & MASSACHUSETTS CONSTITUTION

72.     Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

73.     The Free Exercise Clause of the First Amendment to the Unites States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Dr. Wines's right to free exercise of religion.

74.     The religion clauses in the First Amendment of the United States Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I.

75.     Similarly, the Massachusetts Constitution provides that "No law shall be passed prohibiting the free exercise of religion."  Mass. Const. Art. XVIII § 1.

76.     By terminating Dr. Wines's faculty appointment because he exercised his sincere religious beliefs in the course of his employment with a third party, HMS violated Dr. Wines's fundamental rights, under the United States Constitution and Massachusetts Constitution, to the free exercise of religion.

77.     To the extent that Mass Brigham General was the party to originally violate Dr. Wines's rights to free exercise of religion, HMS ratified and adopted Mass General Brigham's constitutional violation when HMS also chose to strip Dr. Wines of his faculty appointment.

78.      HMS was a state actor and/or instrumentality of the government for purposes of the conduct at issue.

79.     Because of HMS's conduct and inactions as aforementioned, HMS denied and violated Dr. Wines's constitutional rights to free exercise of religion.

80.     Dr. Wines has been harmed by HMS's violation of his constitutional rights.

81.     Dr. Wines is entitled to damages as a result of these violations.

**COUNT VIII – VIOLATION OF 42 U.S.C. § 2000bb-1**

82.     Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

83.     HMS violated 42 U.S.C. § 2000bb-1 by substantially burdening Dr. Wines's exercise of religion, while HMS was effectively an instrumentality of the federal government.

84.     Specifically, HMS terminated Dr. Wines's faculty appointment because he exercised his sincere religious beliefs in the course of his employment with a third party.

17

85.    Because of HMS's conduct and inactions as aforementioned, HMS violated 42 U.S.C. § 2000bb-1.

86.    Dr. Wines has been harmed by HMS's violation of 42 U.S.C. § 2000bb-1.

87.    Dr. Wines is entitled to damages as a result of HMS's violations.

## COUNT IX – CIVIL CONSPIRACY

88.    Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

89.    Upon information and belief, HMS had a common plan with Mass General Brigham to identify individuals who were both HMS faculty members and Mass General Brigham employees; require them to receive COVID-19 vaccinations; and wrongfully subject them to adverse, discriminatory treatment if they would not receive COVID-19 vaccinations.

90.    Both HMS and Mass General Brigham took affirmative steps toward the achievement of that shared purpose.  Mass General Brigham denied Dr. Wines's Exemption Requests and terminated his employment.  Upon information and belief, HMS must have been in communication with Mass General Brigham about Dr. Wines's religious objections to and medical contraindications for COVID-19 vaccines because at or around the same time Mass General Brigham terminated Dr. Wines's employment, HMS took the further step of terminating Dr. Wines's faculty appointment.

91.    Because of HMS's concerted action with Mass General Brigham to commit wrongful conduct, HMS is liable for civil conspiracy.

92.    Dr. Wines has been harmed by HMS's civil conspiracy.

93.    Dr. Wines is entitled to damages as a result of HMS's civil conspiracy.

## COUNT X – VIOLATION OF G.L. c. 93A, §§ 2 AND 11

94.    Dr. Wines realleges and incorporates herein the allegations contained within the foregoing paragraphs of this Complaint.

95.    Dr. Wines and HMS are both engaged in trade and commerce.

96.    Dr. Wines's interactions with HMS occurred in a business context, including because professional motivations and research funding were primary aspects of the parties' dealings.

97.    HMS engaged in unfair and deceptive acts by, among other things:

    i.    Wrongfully stripping Dr. Wines of his earned academic appointment on the basis of discriminatory reasoning;

    ii.    Concealing from Dr. Wines that he had been deprived of his academic appointment;

    iii.    Upon information and belief, knowingly and willfully violating the contractual rights conferred on Dr. Wines by the HMS Handbook;

    iv.    Unfairly and substantially injuring Dr. Wines's reputation, professional development, career opportunities, and future earning potential by making the bad faith, discriminatory decision to deprive Dr. Wines of his earned academic appointment;

    v.    Upon information and belief, coordinating with Dr. Wines's then-employer, Mass General Brigham, to immorally and unethically coerce Dr. Wines into receiving an unwanted medical intervention, despite his religious and medical objections to such medical intervention;

     vi.  Retaliating against Dr. Wines in bad faith by terminating his earned academic appointment on the basis of his religious beliefs, academic viewpoints, political beliefs, and medical condition; and

     vii.  Oppressing Dr. Wines on the basis of his sincerely held religious beliefs.

98.    HMS's unfair and deceptive acts and practices took place primarily and substantially within Massachusetts.

99.    Dr. Wines was harmed as a result of HMS's unfair and deceptive acts and practices.

100.    Dr. Wines is entitled to damages as a result of these violations.

## PRAYER FOR RELIEF

Dr. Wines prays that this Court:

A.  Enter Judgment in Dr. Wines's favor and against Defendant on all Counts;

B.  Award Dr. Wines compensatory, general, and punitive damages;

C.  Award Dr. Wines treble damages pursuant to G.L. c. 93A;

D.  Award Dr. Wines his attorneys' fees and costs;

E.  Grant Dr. Wines equitable relief; and

F.  Award Dr. Wines such other relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Dr. Wines hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

James D. Wines, Jr., M.D., M.P.H.,

By his Attorneys

Dated: November 8, 2024

/s/ Sarah M. Milkovich
Sarah M. Milkovich (BBO No. 705661)
Douglas S. Brooks (BBO No. 636697)
LIBBY HOOPES BROOKS & MULVEY, P.C.
260 Franklin Street
Boston, MA 02110
(617) 338-9300
smilkovich@lhbmlegal.com
dbrooks@lhbmlegal.com