UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JAMES WINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 25-10203-LTS |
| | ) | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER ON MOTION TO DISMISS (DOC. NO. 13)

September 22, 2025

SOROKIN, J.

James Wines brings this suit against the President and Fellows of Harvard College ("Harvard"), alleging various violations of both federal and state law arising out of the termination of his faculty appointment. In his complaint, Wines alleges that the "sole basis for Harvard's decision" was "the fact that Mass General Brigham ["MGB," a Harvard-affiliated hospital] had separately terminated" his employment when he failed to receive the COVID-19 vaccine as required by MGB. Doc. No. 1-1 ¶ 16.[1] Wines avers that because MGB's decision was wrongful, Harvard's termination of his academic position was also tainted. For the reasons that follow, Harvard's Motion to Dismiss, Doc. No. 13, is ALLOWED.

---

[1] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

I. BACKGROUND

The following facts are drawn from the complaint and the Harvard Medical School ("HMS") Faculty of Medicine Handbook ("the Handbook") incorporated therein by Wines's own allegations,[2] as the law requires. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In 1989, Dr. Wines began working as an Intern at MGB. Doc. No. 1-1 ¶ 6. MGB is a Harvard-affiliated hospital system. Id. ¶ 11. In 1993, Dr. Wines was appointed to HMS's Faculty of Medicine as an Instructor of Psychiatry upon completion of a competitive and rigorous appointment process. Id. ¶¶ 3, 6. He then held this position at HMS for nearly thirty years, renewing the appointment every two or three years. Id. ¶¶ 6-7. Throughout this period, his relationship with Harvard was governed by the Handbook. Id. ¶ 8. Wines does not dispute that he retained his employment at MGB while holding his academic appointment at Harvard; indeed, his complaint rests on the premise that he was employed by MGB during this time.

---

[2] When a complaint expressly cites and relies upon a written contract in support of a claim, the Court may consider the written contract in ruling on a motion under Federal Rule of Civil Procedure 12(b)(6). See In re Fid. ERISA Fee Litig., 990 F.3d 50, 53-54 (1st Cir. 2021); Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."). Here, Wines cited in his complaint the link to the current version of the Handbook, which was updated in June 2025, and referenced specific provisions. Doc. No. 1-1 ¶¶ 8 n.1, 18-22. Harvard attached to its Motion to Dismiss the 2020 version of the Handbook that was in place at the time of Wines's termination. While Wines does not dispute the authenticity of Harvard's document or that a different version exists, he argues that the Court "should rely on the version of the HMS Handbook cited in the Complaint" "because there are no facts in evidence (or sworn affidavits) to establish whether the version filed" "was in fact the operative version." Doc. No. 18 at 7 n.1. In weighing the two versions of the Handbook, the Court recognizes that the 2025 version of the Handbook could not have been operative at the time of Wines's termination in 2021. But in light of Wines's reliance on the 2025 Handbook in his complaint, the Court considers the contents of the 2025 Handbook for the purposes of this order. The Court notes, however, that the relevant provisions of the Handbook are identical in both versions, apart from minor differences that do not impact the claims in this case. The Court notes any differences in language between the two versions of the Handbook infra.

2

On June 24, 2021, MGB's President and CEO announced that MGB would begin requiring all its employees to receive one of three COVID-19 vaccines, unless they were granted medical or religious exemptions.  Id. ¶ 12.  This was an MGB policy that applied to MGB employees, according to the allegations of the complaint.  Wines does not dispute that this policy applied to him as an employee of MGB.  In response to the policy, Wines sought both types of exemptions from the relevant MGB officials, and MGB denied both requests.  Id. ¶¶ 13-14.  Thereafter, Wines chose not to receive the required vaccines, and MGB accordingly terminated his employment on November 10, 2021.  Id. ¶ 15.

Harvard "around the same time" terminated Dr. Wines's academic appointment.  Id. ¶ 16.  Wines alleges that "the sole basis for Harvard's decision to deprive Dr. Wines of his academic appointment was the fact that Mass General Brigham had separately terminated Dr. Wines's employment."  Id.  Of course, such an outcome is unsurprising given the plain language of the Handbook on which Wines relies.  It provides:

> For those faculty based at HMS/HSDM affiliated institutions, maintenance of an appointment in the Faculty of Medicine is dependent on, among other criteria, holding a simultaneous appointment at the affiliated institution, ordinarily associated with salaried employment.  If the appointment at the affiliated institution is terminated, the Harvard appointment will also end.[3]

Off. Fac. Aff., Faculty of Medicine Handbook § 4.6, https://facultyhandbook.hms.harvard.edu/ 4eligibility-appt-terms/term-notice/ [https://perma.cc/VG8C-57WV].  In other words, the Handbook establishes that for HMS faculty based at Harvard-affiliated hospitals such as MGB, the termination of the faculty member's appointment at the affiliated hospital triggers the termination of their Harvard appointment.

---

[3] The 2020 version of the Handbook contains the same language but excludes the phrase "ordinarily associated with salaried employment."  Doc. No. 14-1 at 25.

Wines also points to a number of other provisions of the Handbook. Regarding terminations, the Handbook goes on to state:

> It is expected that faculty who hold annual or term appointments and trainees will be given written notice of the termination of their appointment at the affiliated institution and the associated loss of the Harvard appointment if the termination is to occur prior to the conclusion of the designated term. The expected period of notice would be . . . Annual appointees (e.g., Associates, Teaching Associates, Research Associates, Lecturers, Instructors, Corresponding Members of the Faculty): three (3) months . . . . Faculty whose employment is terminated for cause, including documented unsatisfactory performance and misconduct, are not required to receive any period of written notice as specified in this policy.[4]

Id. Relying on this language, Wines alleges that Harvard violated the Handbook because it "provided Dr. Wines no notice—written or verbal—that his faculty appointment was being involuntarily terminated." Doc. No. 1-1 ¶ 19.

Both versions of the Handbook also include "Academic Freedom" provisions that guard against dismissal of faculty "for holding controversial opinions, for proposing heretical viewpoints, or for espousing unpopular causes." Doc. No. 14-1 at 19; Off. Fac. Aff., Faculty of Medicine Handbook § 3.2, https://facultyhandbook.hms.harvard.edu/3policies-principles/academic-freedom/ [https://perma.cc/V29X-H94K]. Pointing to this provision, Wines alleges that Harvard violated the Handbook because his termination "was premised on Mass General Brigham's decisionmaking, which was in turn premised on viewpoint discrimination against Dr. Wines's controversial minority viewpoint related to COVID-19 vaccines." Doc. No. 1-1 ¶ 20.

The Handbook also includes a non-discrimination policy that provides:

> It is the strong and consistent policy of Harvard University, Harvard Medical School, and Harvard School of Dental Medicine, to treat all members of the communities with respect, to provide an environment conducive to learning and working, and to ensure equal access to rights, privileges and opportunities without regard to race, color, religion, sex, national origin, disability status, protected

---

[4] The 2020 version of the Handbook contains the same language without the specific inclusion of Associates, Teaching Associates, Research Associates, and Corresponding Members of the Faculty in the list of annual appointees. Doc. No. 14-1 at 25.

4

veteran status, gender identity, sexual orientation, pregnancy and pregnancy-related conditions or any other characteristic protected by law or deemed by Harvard to warrant equal rights protection under applicable policies.[5]

Off. Fac. Aff., Faculty of Medicine Handbook § 3.3, https://facultyhandbook.hms.harvard.edu/3policies-principles/non-discrimination/ [https://perma.cc/8AYJ-NPCR]. The complaint alleges that Harvard violated this non-discrimination policy because its termination of Dr. Wines was "on the basis of Mass General Brigham's decision," which was in turn based on discrimination against Dr. Wines's "religious beliefs, disability status, creed, and political beliefs." Doc. No. 1-1 ¶¶ 21-22. As for damages from the loss of his position at Harvard, Wines asserts he "lost out on potential research, publication, grant, employment, and other professional opportunities" due to the loss of his academic appointment. Id. ¶ 24.

Soon after his termination from MGB and the follow-on termination of his status as an Instructor at Harvard, Dr. Wines sued MGB. He did not then sue Harvard. On December 17, 2021, Dr. Wines joined an existing lawsuit against MGB along with many similarly situated MGB employees claiming disability and religious discrimination by MGB.[6] Am. Compl., Adams v. Mass Gen. Brigham Inc., No. 21-cv-11686 (D. Mass. Dec. 17, 2021), ECF No. 58. Wines alleged then (on December 17, 2021) that he "is an employee of defendant [Mass General Hospital]," id. ¶ 18 (emphasis added), although the Court notes for clarity that his present complaint alleges MGB terminated his employment on November 10, 2021, Doc. No. 1-1 ¶ 15. Initially, Wines proceeded with counsel in his case against MGB. Am. Compl., Adams v. Mass

---

[5] The 2020 version of the Handbook contains the same non-discrimination policy but includes the Harvard School of Public Health in the list of schools and does not contain the phrase "or deemed by Harvard to warrant equal rights protection under applicable policies" at the end of the sentence. Doc. No. 14-1 at 21.

[6] While the complaint does not mention the Adams v. Mass General Brigham case, the Court takes judicial notice of Dr. Wines's involvement in that case. See Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

Gen. Brigham Inc., No. 21-cv-11686 (D. Mass. Dec. 17, 2021), ECF No. 58.  Wines later changed counsel before eventually electing to proceed pro se.  Adams v. Mass Gen. Brigham Inc., No. 21-cv-11686-FDS, 2022 WL 17722548, at *4 (D. Mass. Dec. 15, 2022).  On December 15, 2022, Judge Saylor dismissed Wines's claims with prejudice because he "failed" to comply with "unambiguous" discovery questionnaires previously approved in the case.  Id. at *6.  Judge Saylor elaborated that "Dr. Wines has chosen to refuse to provide relevant discovery in this matter."  Id.  Although Judge Saylor dismissed Wines's claims, no final judgment has entered as to Wines or the claims of any other plaintiffs in that case, as the claims of some plaintiffs remain pending.[7]

This brings us to the present case.  On November 8, 2024, Dr. Wines brought a state-court action, this time against Harvard, advancing: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) violation of the Massachusetts Civil Rights Act ("MCRA"), (4) violation of Procedural Due Process, (5) violation of Substantive Due Process, (6) violation of Equal Protection, (7) violation of the Free Exercise Clause, (8) violation of the Religious Freedom Restoration Act ("RFRA"), (9) civil conspiracy between Harvard and MGB, and (10) unfair business practices in violation of Mass. Gen. Laws ch. 93A.  Harvard

---

[7] Wines did file a notice of appeal.  Notice of Appeal, Adams v. Mass Gen. Brigham Inc., No. 21-cv-11686 (D. Mass. Jan. 9, 2023), ECF No. 141.  The Court of Appeals dismissed the appeal for lack of jurisdiction due to the absence of a final judgment, USCA Judgment, Adams v. Mass Gen. Brigham Inc., No. 21-cv-11686 (D. Mass. July 10, 2023), ECF No. 171, after Judge Saylor declined to issue a separate and final judgment or otherwise certify any issues to the Court of Appeals.  Adams v. Mass Gen. Brigham Inc., No. 21-cv-11686 (D. Mass. May 10, 2023), ECF No. 166.  Wines reports the filing of his notice of appeal in his opposition, Doc. No. 18 at 9, but fails to disclose that the Court of Appeals dismissed the appeal.  Id.  While not material to nor considered by the Court in the resolution of the Motion to Dismiss, the Court notes that Wines omitted a material portion of the procedural history of the appeal.

timely removed the case to this Court.  Doc. No. 1.  Currently before the Court is Harvard's Motion to Dismiss all of Wines's claims.  Doc. No. 13.

II.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must present facts that make his claim plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  To state a plausible claim, a complaint need not detail factual allegations, but the facts must suffice at least to "raise a right to relief above the speculative level."  Id. at 555.  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" cannot suffice.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  In addition, "an adequate complaint must include not only a plausible claim but also a plausible defendant."  Penalbert-Rosa v. Fortuno-Burset, 631 F.3d 592, 594 (1st Cir. 2011).

III.   DISCUSSION

A.   Contract Claims (Counts I-II)

Wines first advances breach-of-contract claims, arguing that Harvard violated the non-discrimination policy, academic freedom policy, and notice requirement provided in the Handbook when it terminated his academic appointment.  Doc. No. 1-1 ¶¶ 26-31.  He also suggests that in so doing, Harvard violated the implied covenant of good faith and fair dealing, present in every Massachusetts contract.  Id. ¶¶ 32-37; see also Ayash v. Dana Farber Cancer Inst., 822 N.E.2d 667, 683 (Mass. 2005).  The implied covenant provides "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 164 (1st Cir. 2020) (citing A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth., 95 N.E.3d 547, 560 (Mass. 2018)).  However, the implied covenant of good faith and fair dealing "does not

7

create rights or duties beyond those the parties agreed to when they entered into the contract." Id. (citing Bos. Med. Ctr. Corp. v. Sec'y of Exec. Off. of Health & Hum. Servs., 974 N.E.2d 1114, 1126-27 (Mass. 2012)). In addition, the plaintiff bears the burden of presenting evidence of bad faith or an absence of good faith. Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013).

Here, Wines contends that the Handbook "is a binding contract between Harvard and its faculty members," Doc. No. 1-1 ¶ 27, and his breach-of-contract claim arises out of various provisions in the Handbook upon which he relies. Assuming without deciding that the Handbook constitutes a binding contract between the parties, Wines's claims fail under the plain language of the Handbook.[8] Both versions of the Handbook make clear that when a faculty member's "appointment at the affiliated institution is terminated, the Harvard appointment will also end." Off. Fac. Aff., Faculty of Medicine Handbook § 4.6, https://facultyhandbook.hms.harvard.edu/4eligibility-appt-terms/term-notice/ [https://perma.cc/VG8C-57WV]; Doc. No. 14-1 at 25. Put another way, the Handbook conditions a faculty member's academic position at HMS on "holding a simultaneous appointment at the affiliated institution." Off. Fac. Aff., Faculty of Medicine Handbook § 4.6, https://facultyhandbook.hms.harvard.edu/4eligibility-appt-terms/term-notice/ [https://perma.cc/VG8C-57WV]; Doc. No. 14-1 at 25. Thus, when Wines lost his position at the affiliated hospital, he necessarily and automatically lost his appointment at the medical school pursuant to the plain meaning of this provision.

---

[8] Of course, if the Handbook does not constitute a binding contract between the parties, then Wines's contract-based claims, Counts I and II, necessarily fail due to the absence of a contract. The 2020 version of the Handbook, in its Table of Contents, explicitly states "[t]his handbook does not constitute a contract of employment nor a promise of any kind." Doc. No. 14-1 at 7. The 2025 Handbook omits this provision. The Court need not resolve whether the Handbook constitutes a contract because Wines alleges no contract between the parties other than the Handbook, and his claims fail even if the Handbook constitutes a binding contract.

As for the notice provision, the Handbook only states that "[i]t is expected" that HMS faculty "will be given written notice of the termination of their appointment at the affiliated institution and the associated loss of the Harvard appointment."[9]  Off. Fac. Aff., Faculty of Medicine Handbook § 4.6, https://facultyhandbook.hms.harvard.edu/4eligibility-appt-terms/term-notice/ [https://perma.cc/VG8C-57WV].  The Handbook proceeds to explain that the "expected period of notice" for Instructors is "three (3) months."[10]  Id.  While Wines relies on this section of the Handbook to assert that Harvard failed to provide him with the requisite notice, this language from the Handbook merely describes an "expected" practice of the affiliated institution, not a binding requirement undertaken by Harvard.  See Expect, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/definition/american_english/expect?q=expect [https://perma.cc/8Y5S-T32H] (last visited Sept. 17, 2025) (defining "expect" as "to think or believe that something will happen or that someone will do something").  The plain language of the Handbook imposes no obligation on Harvard to provide any notice, let alone three months' notice, of the consequences of an action taken by a different entity not party to the contract.  And in any event, Dr. Wines has not alleged that MGB did not provide him with the expected notice for his termination.[11]

---

[9] The 2020 version of the Handbook contains the same language.  Doc. No. 14-1 at 25.

[10] The 2020 version of the Handbook contains the same language.  Doc. No. 14-1 at 25.

[11] Wines's complaint describes that his termination from MGB was the outcome of a lengthy process.  MGB first announced its COVID-19 vaccination policy on June 24, 2021.  Doc. No. 1-1 ¶ 12.  On or about September 2, 2021, Dr. Wines submitted medical and religious exemption requests to MGB.  Id. ¶ 13.  MGB then denied Dr. Wines's medical exemption request on September 17, 2021, and his religious exemption request on September 23, 2021.  Id. ¶ 14.  After Dr. Wines refused to receive a COVID-19 vaccination, MGB terminated his employment on November 10, 2021.  Id. ¶ 15.  To the extent notice is required, he received it in the course of this process which lasted well more than three months.

9

Finally, the policies Wines argues Harvard violated (i.e., the non-discrimination and academic freedom clauses) when it terminated his appointment are not relevant to Harvard's termination. Wines alleges that Harvard's "sole basis" for the termination of his academic appointment was the termination of his employment with MGB. See Doc. 1-1 ¶ 16. Wines has not advanced non-conclusory factual allegations that would render Harvard legally responsible for MGB's decision to terminate Wines. In other words, even if MGB's termination of Wines's employment was wrongful, Harvard is not responsible for MGB's wrong. A simple example illustrates the point. Suppose a hospital conditioned a doctor's employment upon maintaining an active medical license with the Commonwealth of Massachusetts and warned that loss of the license would terminate employment at the hospital. Even if the Commonwealth wrongfully terminated the doctor's license, under the doctor's contract with the hospital, the hospital would not be responsible for that wrong—and would be contractually entitled to terminate the doctor's employment because of the loss of the license. The same is true here.

Furthermore, even assuming there were other bases for Harvard's termination, Wines has not alleged sufficient facts to support his conclusion that Harvard's termination violated the academic freedom and non-discrimination provisions in the Handbook. Wines has not alleged, for example, that he asserted controversial opinions known to Harvard which then motivated Harvard's termination decision, nor has he advanced non-conclusory allegations that Harvard had a discriminatory motive for terminating his academic appointment. Indeed, the complaint plainly alleges that he lost the position at Harvard "sole[ly]" because he was terminated by MGB.

In sum, Wines has not plausibly alleged a breach of contract. He also has not plausibly alleged any separate violation of the implied covenant of good faith and fair dealing in these circumstances. Therefore, the Motion to Dismiss Counts I and II is ALLOWED.

  B. <u>Constitutional Claims (Counts IV-VII)</u>

Wines next advances several constitutional claims, including violations of Procedural and Substantive Due Process, Equal Protection, and the Free Exercise Clause. Doc. No. 1-1 ¶¶ 46-81. It is well-settled that in order to advance these claims, the plaintiff "must show that [the defendant] is a state actor and that its conduct was state action." <u>Johnson v. Educ. Testing Serv.</u>, 754 F.2d 20, 23 (1st Cir. 1985). Generally, a non-governmental organization is not subject to § 1983 claims. <u>Mead v. Indep. Ass'n</u>, 684 F.3d 226, 231 (1st Cir. 2012). Harvard is not a governmental actor. Thus, Wines can advance constitutional claims against Harvard "only in [the] rare circumstance" when Harvard's conduct may be fairly attributed to the state and may constitute action under color of state law. <u>Estades-Negroni v. CPC Hosp. San Juan Capestrano</u>, 412 F.3d 1, 4-5 (1st Cir. 2005). Wines bears the burden of proving that Harvard's acts constitute state action. See <u>Flagg Bros. v. Brooks</u>, 436 U.S. 149, 156, (1978).

To determine whether a private party is a state actor within the purview of § 1983, the First Circuit has employed three possible tests. <u>Cruz-Arce v. Mgmt. Admin. Servs. Corp.</u>, 19 F.4th 538, 543-44 (1st Cir. 2021). "First, a private party may be considered a state actor if it assumes a public function which, by tradition, is exclusively reserved to the state (the public function test)." <u>Id.</u> at 544. "Second, a private party may be considered a state actor if its conduct is coerced or significantly encouraged by the state (the state compulsion test)." <u>Id.</u> "Third, a private party may be considered a state actor if it and the state have entered into so symbiotic a relationship that they have become joint participants in the challenged conduct (the nexus/joint action test)." <u>Id.</u>

11

Harvard is plainly not a state actor under any of these tests. Regarding the public function test, Wines avers that "[f]orced vaccination meets the public function test because it has historically been 'exclusively reserved to the state.'" Doc. No. 18 at 20 (citing Cruz-Arce, 19 F.4th at 544). This contention falls short in several respects. For one thing, it is conclusory. It is also inaccurate and unsupported by the authority Wines cites. Cruz-Arce importantly explains that "the public function test does not turn solely on whether a private party is performing some public function (that is, a public purpose being executed on behalf of the state). It turns instead on whether the public function is one that has been 'traditionally exclusively reserved to the State.'" 19 F.4th at 545. It goes on to specify:

> The Supreme Court has found this aspect of the test to be satisfied only in narrowly circumscribed contexts—contexts in which a particular function rests at the core of a state's sovereign responsibilities. These contexts include the administration of elections; the management of a town in which the private party serves almost all the functions of government; the administration and provision of health care in prisons; and—in special circumstances—the operation of a municipal park.

Id. (citation modified). Wines has not plausibly alleged, and cannot plausibly allege, that requiring vaccines is within the "narrowly circumscribed contexts" that can satisfy this test. Moreover, "forced vaccination" is not even what transpired here. Wines was not required to become vaccinated, nor does he allege that he was ever vaccinated (against his will or otherwise). And caselaw rejects the contention that vaccine policies implemented by private entities meet the public function test. Devitt v. Sanofi-Aventis US, LLC, No. 4:23-cv-10516-MRG, 2025 WL 2207277, at *8 (D. Mass. Aug. 4, 2025); Thornton v. Ipsen Biopharmaceuticals, Inc., No. 23-cv-11171-JCB, 2023 WL 7116739, at *5 (D. Mass. Oct. 26, 2023), aff'd in part, rev'd in part on other grounds, 126 F.4th 76 (1st Cir. 2025).

Second, Wines fails to plausibly allege that Harvard satisfies the state compulsion test. At issue in the complaint is MGB's vaccination mandate, not any mandate issued by Harvard.

12

While Wines alleges that Harvard implemented its own policy requiring faculty members to receive COVID-19 vaccinations, Wines makes no allegation that Harvard relied on its own vaccination policy when it terminated his academic appointment.  Doc. No. 1-1 ¶ 25.  In any case, Wines does not plausibly allege that either Harvard's or MGB's vaccination policy was the result of state compulsion.  The complaint alleges in conclusory fashion that, "[u]pon information and belief, Harvard and Mass General Brigham were subjected to coercion by State and Federal governments to enact mandatory COVID-19 vaccination requirements so that they would not lose any governmental funding."  Id.  However, "government regulation, even extensive regulation, and the receipt of federal funds, . . . are insufficient to establish that a hospital or other entity acted under color of state law."  Rockwell v. Cape Cod Hosp., 26 F.3d 254, 258 (1st Cir. 1994).  Wines himself admits that he cannot "allege with specificity, without the benefit of discovery, the extent to which government funding contingent upon COVID-19 vaccinations posed an existential threat" "that amounted to coercion."[12]  Doc. No. 18 at 21.  Wines bears the burden to advance non-conclusory factual allegations plausibly making out this theory.  Merely alleging that Harvard was subject to coercion is not sufficient to meet the pleading burden.  Thus, the state compulsion test is unavailing here.

Third, Wines fails to plausibly allege joint action between Harvard and the state for much the same reason as the failure of the state compulsion theory.  Harvard did not compel him to obtain a vaccine; MGB issued the relevant directive.  Whatever the relationship between MGB

---

[12] Wines contends that additional evidence can be "sought through the discovery process to undergird the existence of state action under the nexus and/or state compulsion tests."  Doc. No. 18 at 21.  Nonetheless, "[p]laintiffs are not entitled to discovery on facts they did not allege in their complaint," and "[i]nadequate allegations of state action are regularly handled at the motion to dismiss stage."  Leaver v. Life Care Ctrs. of Am., Inc., 712 F. Supp. 3d 194, 200 (D. Mass. 2024) (citing Cruz-Arce, 19 F.4th 538 (1st Cir. 2021)).

and the state, that is a matter between different entities. Moreover, Wines concedes that, at this time, he does not know "the degree to which Harvard's decisionmaking and joint decisionmaking with MGB involved individuals who were also public employees, public officials, and/or government appointees." Doc. No. 18 at 21. Beyond alleging that Harvard and MGB "received incentives from the government for implementing and maintaining COVID-19 related mandates," Doc. No. 1-1 ¶ 25, the complaint is devoid of allegations about any communication, much less joint participation, between the state and Harvard. As Wines did not meet his burden of pleading that Harvard was a state actor when it terminated his academic appointment, Harvard's Motion to Dismiss his constitutional claims (Counts IV-VII) is ALLOWED.

    C.    MCRA Claim (Count III)

Wines also brings a claim under the MCRA, Mass. Gen. Laws ch. 12, § 11H. Doc. No. 1-1 ¶¶ 38-45. The MCRA prohibits "interfer[ing] by threats, intimidation or coercion, or attempt[ing] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth[.]" Mass. Gen. Laws ch. 12, § 11H. Wines alleges that Harvard "interfered with, or attempted to interfere with" the exercise of his constitutional rights. Doc. No. 1-1 ¶ 40.

This claim fails because Harvard was not the party involved in the alleged interference with Wines's constitutional rights. According to the complaint, it was MGB that imposed a COVID-19 vaccination policy on Dr. Wines, rejected his exemption requests, and terminated him after he did not receive a vaccine. Id. ¶¶ 12-15. Wines does not allege that Harvard was in any way involved or implicated in MGB's termination decision. Rather, the complaint asserts that MGB "separately terminated" Dr. Wines's employment based on his non-compliance with

MGB's vaccination policy.  Id. ¶¶ 15-16.  Thus, even if Dr. Wines's termination did constitute an interference with his constitutional rights, the alleged circumstances surrounding Dr. Wines's termination point to MGB, not Harvard, as the appropriate defendant for this MCRA claim.

Wines argues that, because "HMS based its termination decision on Mass General Brigham's decisionmaking, HMS's adverse decision was tainted by the same religious, medical, and academic viewpoint discrimination underlying Mass General Brigham's wrongful termination."  Id. ¶ 16.  But the complaint fails to allege non-conclusory facts to support this assertion.  By contrast, the complaint and the incorporated Handbook make clear that Harvard terminated Dr. Wines's academic appointment at HMS based on its neutral policy of terminating appointments for faculty members who lose their positions at affiliated institutions.  Id.; Off. Fac. Aff., Faculty of Medicine Handbook § 4.6, https://facultyhandbook.hms.harvard.edu/4eligibility-appt-terms/term-notice/ [https://perma.cc/VG8C-57WV].  The Motion to Dismiss Count IV is therefore ALLOWED.

D.   RFRA Claim (Count VIII)

Wines next seeks to invoke RFRA, "which prohibits the Federal Government from substantially burdening a person's exercise of religion, unless the Government 'demonstrates that application of the burden to the person' represents the least restrictive means of advancing a compelling interest."  Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 423 (2006) (quoting 42 U.S.C. § 2000bb-1(b)).  RFRA, however, does not regulate conduct by state (as opposed to federal) actors, because the Supreme Court invalidated RFRA as applied to states and their subdivisions.  See City of Boerne v. Flores, 521 U.S. 507, 532-36 (1997).  RFRA remains operative only as to the federal government.  See Cutter v. Wilkinson, 544 U.S. 709, 715 n.2 (2005).

Because Wines brings claims concerning MGB's vaccine policy, a claim under RFRA is not available to him here. Harvard is not the federal government (nor, for that matter, is MGB), and Wines has not alleged sufficient facts to support his claim that Harvard "was effectively an instrumentality of the federal government." Doc. No. 1-1 ¶ 83. For similar reasons as applicable to his constitutional claims, Wines's RFRA claim must be DISMISSED.

  E. Civil Conspiracy Claim (Count IX)

Wines next alleges a civil conspiracy. Doc. No. 1-1 ¶¶ 88-93. "Massachusetts law recognizes two distinct theories of liability under the umbrella term of 'civil conspiracy.'" Greene v. Philip Morris USA Inc., 208 N.E.3d 676, 682 (Mass. 2023). First, there is the "concerted action" theory, which "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Id. at 683 (quoting Kurker v. Hill, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998)). "Because it is vicarious liability, this type of civil conspiracy requires an underlying tort and the conspiracy consists in agreeing to, or assisting in, this underlying tort." Thomas v. Harrington, 909 F.3d 483, 490 (1st Cir. 2018) (citation modified). The second theory of conspiracy "amounts to a very limited cause of action in Massachusetts for civil conspiracy based on the defendants' allegedly unique ability to exert a peculiar power of coercion when acting in unison." Snyder v. Collura, 812 F.3d 46, 52 (1st Cir. 2016) (citation modified).

Here, Wines seems to rely on the first theory of conspiracy, asserting that "HMS had a common plan with Mass General Brigham" to "identify individuals" working at both institutions, "require them to receive COVID-19 vaccinations," and "wrongfully subject them to adverse, discriminatory treatment if they would not receive COVID-19 vaccinations." Doc. No. 1-1 ¶ 89. However, Wines has not advanced non-conclusory facts plausibly alleging this theory. Wines maintains that "HMS must have been in communication with Mass General Brigham about Dr.

Wines's religious objections to and medical contraindications for COVID-19 vaccines . . . ." Id. ¶ 90. Perhaps the strongest (and only) fact that Wines can wield to support this claim is a sentence in the 2025 version of the Handbook, which provides that "[a]ffiliated institutions must inform the Office for Faculty Affairs (OFA) of all appointment terminations, . . . along with a brief explanation."[13] Off. Fac. Aff., Faculty of Medicine Handbook § 4.6, https://facultyhandbook.hms.harvard.edu/4eligibility-appt-terms/term-notice/ [https://perma.cc/VG8C-57WV].  But the mere fact that MGB may have communicated its reasons for terminating Dr. Wines with Harvard does not establish a sufficient factual basis to infer that Harvard and MGB took concerted action against Dr. Wines.

The facts alleged in the complaint and the language of the Handbook do not plausibly suggest that Harvard terminated Dr. Wines because of some common plan with MGB to impose a discriminatory vaccine policy.  Rather, they overwhelmingly support an inference that Dr. Wines lost his HMS position because he lost his qualifying employment at an affiliated hospital.  Accordingly, Count IX must also be DISMISSED.

      F.    Chapter 93A Claim (Count X)

Finally, Wines advances a claim under Chapter 93A, which prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a). While true that "[a]n entity's status as a charitable corporation is not, in and of itself, dispositive of the issue of whether Chapter 93A applies," "in most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core

---

[13] It should be noted that the 2020 version of the Handbook, which was likely in effect at the time of Dr. Wines's termination from HMS, does not require affiliated institutions to provide a "brief explanation" of their termination to Harvard.  The 2020 version of the Handbook simply states that "[a]ffiliated institutions must inform the Office for Faculty Affairs (OFA) of all appointment terminations." Doc. No. 14-1 at 25.

17

mission." Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 207, 209 (Mass. 1997) (citation modified). Similarly, activities that are "purely incidental to the university's educational mission" are generally not subject to Chapter 93A. Id. at 208. In addition, "employment agreements between an employee and the organization of which he is a member do not constitute 'trade' or 'commerce.'" Manning v. Zuckerman, 444 N.E.2d 1262, 1265 (Mass. 1983)).

Measured against these straightforward standards, Wines has failed to allege a plausible Chapter 93A claim. Harvard plainly was not engaging in trade or commerce when it executed its policies in a personnel handbook with respect to terminating appointments of faculty not affiliated with any of its associated hospitals. Even if, as Wines alleges, "professional motivations and research funding were primary aspects of the parties' dealings," Doc. No. 1-1 ¶ 96, these dealings were incidental to the university's educational mission of engaging faculty who are employed with teaching hospitals. And even if, as Wines alleges, Harvard "stripp[ed] [Wines] of his earned academic appointment on the basis of discriminatory reasoning," id. ¶ 97, it was not Harvard, but MGB, that deployed this "discriminatory reasoning." Wines himself alleges that the sole reason his Harvard appointment was terminated was because his employment with MGB was terminated. Id. ¶ 16. The Motion to Dismiss Count X is ALLOWED.

IV.     CONCLUSION

Accordingly, Harvard's Motion to Dismiss, Doc. No. 13, is ALLOWED.[14]  A separate judgment of dismissal will enter.  Each side shall bear its own costs and fees.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

---

[14] The Court notes one other potential issue.  Principles of claim and issue preclusion arising from Wines's earlier suit against MGB have no application to this case at this time, because no final judgment has entered in the case pending before Judge Saylor.  See Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc., 181 F.3d 174, 177 (1st Cir. 1999) ("Under federal law, a final judgment on the merits of an action precludes the parties from relitigating claims that were raised or could have been raised in that action.").  Whether such principles would apply after a final judgment—and if so, how and whether they might give rise to a stay pending an appeal from an eventual final judgment in Judge Saylor's case—are considerations beyond the scope of the present motion.  However, had this case survived Harvard's Motion to Dismiss, the Court would have faced a serious question as to whether to stay this case pending a final outcome in Judge Saylor's case, given its potential preclusive effect.